UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X   **Docket No.:**

KARINA RODRIGUEZ,

                       Plaintiff,

-against-                       **COMPLAINT**

THE CITY OF NEW YORK, ANNE-MARIE   **JURY TRIAL REQUESTED**
HENDRICKSON, ERIC ENDERLIN,
VICTOR HERNANDEZ, SHATARA PELL,
MARGARET BROWN, LISA TALMA, and
JOHN and JANE DOES 1-5 (said names being
fictitious, the persons intended being those who
aided and abetted the unlawful conduct of the
named Defendants),

                       Defendants.
-------------------------------------------------------X

      Plaintiff KARINA RODRIGUEZ ("Plaintiff" or "RODRIGUEZ"), by her attorneys,

**MADUEGBUNA COOPER LLP**, complaining of the Defendants, alleges as follows:

## I.    NATURE OF THIS ACTION

      1.    Plaintiff RODRIGUEZ brings this action to secure protection of and to redress

deprivation of rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42

U.S.C. § 1983 ("Section 1983"), and 42 U.S.C. § 1981, as amended by the Civil Rights Act of

1991, 42 U.S.C. § 1981(a) ("Section 1981"); the New York State Human Rights Law as contained in

New York State Executive Law, § 296, *et seq.* ("NYSHRL"); and the New York City Human Rights

Law as contained in the Administrative Code of the City of New York, § 8-107, *et seq.*

("NYCHRL"); providing for injunctive relief and other relief against discrimination on the basis of

race, color, and age.

      2.    As part of her employment discrimination claims, Plaintiff RODRIGUEZ was

denied promotions on the basis of race, color, and age. She was retaliated against after

complaining about discriminatory conduct while working as an employee in the Department of Housing Preservation and Development ("HPD") of the City of New York ("CITY").

3.      RODRIGUEZ also brings this action to redress retaliation for opposing improper and discriminatory housing lottery practices that disadvantaged an African American applicant for subsidized housing pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("Fair Housing Act"); Sections 1983 and 1981; the NYCHRL; the NYSHRL; and the New York Civil Service Law § 75-b ("Section 75-b").

## II.      JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

5.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state and city causes of action.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in the Southern District of New York.

## III.      PROCEDURAL REQUIREMENTS

7.      Before filing this action, Plaintiff served a copy of the complaint on the New York City Commission of Human Rights and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code Section 8-502(c).

## IV.      THE PARTIES

8.      Plaintiff RODRIGUEZ is a black female and is forty-one (41) years old. She is a resident of New York County.

9.      Since August 2005, RODRIGUEZ has been continuously employed by HPD as a Project Manager in several units, including the Narcotics Unit/Community Board until 2009, the Office of Development, and the Office of Asset & Property Management.

10.     At all times relevant, RODRIGUEZ performed the duties of Project Manager, with responsibility for marketing all phases of the Agency's affordable housing projects, acting as public liaison responding to public inquiries about the Agency's affordable housing programs, conducting research and analysis on the Agency's marketing statistics and procedures, and determining applicant eligibility for affordable housing.

11.     RODRIGUEZ was well qualified to work in several positions within HPD and has an excellent record of performance and accomplishments.

12.     RODRIGUEZ is a member of Communication Workers of America, AFL-CIO, CLC, Local 1180 (the "Union").

13.     Defendants are the CITY and its employees who participated in, and contributed to, the discriminatory employment practices Plaintiff opposes.

14.     At all relevant times, by virtue of their respective positions, the individual defendants were responsible for developing, implementing, and enforcing personnel policies and procedures affecting the terms and conditions of employment for HPD employees, including Plaintiff.

15.     Defendant CITY is a municipal agency existing by virtue of the laws of the State of New York.

16.     HPD is a mayoral agency of the City.

17.     Defendant Anne-Marie Hendrickson ("HENDRICKSON"), a black female, is an employee of the City and HPD.

18.     At all relevant times HENDRICKSON was the Deputy Commissioner of the Office of Asset & Property Management.

19.     As Deputy Commissioner, HENDRICKSON supervised five divisions and nineteen units, including the Marketing Unit, starting in or about August 2014.

20.     Defendant Victor Hernandez ("HERNANDEZ"), a white male of Hispanic descent, is an employee of the City and HPD.

21.     At all relevant times, HERNANDEZ was Director of the Marketing Unit.

22.     Defendant Eric Enderlin ("ENDERLIN"), a white male, is a former employee of the City and of HPD.

23.     From June 2013 to October 2016, ENDERLIN was Deputy Commissioner of Development at HPD.

24.     ENDERLIN's tenure as Deputy Commissioner of Development continued from June 2013 to October 2016 notwithstanding two changes in the Commissioner position at HPD.

25.     Defendant Shatara Pell ("PELL"), a black female, is an employee of the City and HPD.

26.     Beginning in February 2017, Defendant PELL was Deputy Director of the Marketing Unit and supervised RODRIGUEZ.

27.     Defendant Margaret Brown ("BROWN"), a white female, is an employee of the City and HPD.

28.     Defendant BROWN was Assistant Commissioner for Policy & Operations and reported to Defendant HENDRICKSON.

29.     Defendant Lisa Talma ("TALMA"), a black female, is an employee of the City and of HPD, and is and was at all times relevant, Assistant Commissioner in the Division of

Property Disposition & Finance.

30.     The individual defendants are each sued in both their individual and official capacities.

V.     **FACTUAL ALLEGATIONS**

31.     **RODRIGUEZ's Skill, Qualifications, and Experience**RODRIGUEZ currently holds the title of Project Manager at HPD and is a civil service certified Administrative Manager. Her duties include organizing, coordinating and distributing unit guidelines and procedures; reviewing, revising and approving Affirmative Fair Housing Marketing Plans, and conducting marketing conferences with owners, developers and other parties.

32.     For years, RODRIGUEZ has been the lead Project Manager for her unit. In this role, RODRIGUEZ developed and implemented unit guidelines and trained other Project Managers.

33.     From November 2012 to April 2013, RODRIGUEZ was the only full-time Project Manager in her unit. She had to assume the responsibilities of three (3) Project Managers and the director who left the unit.

**A. Since 2008 Defendants have Refused to Promote RODRIGUEZ**

34.     Despite   RODRIGUEZ's   qualifications   and   performance,   Defendants HENDRICKSON, HERNANDEZ and BROWN have refused to promote her or provide a merit-based salary increase. As a result, her career advancement has been blocked.

35.     Since 2008, RODRIGUEZ has applied for higher salaried positions, including: 8A Loan Program Project Manager; Project Manager, Low Income Housing Tax Credit (Year 15); and Loan Officer, PLP. However, RODRIGUEZ was passed over and these positions were given to less qualified, white or younger employees with less experience at HPD.

36.     Defendants have refused to promote her or have prevented her from either applying or interviewing for positions. To block RODRIGUEZ from promotion, Defendants have circumvented established hiring, promotion, and salary increase procedures.

37.     For example, in or about July 2012, Assistant Commissioner Beatriz De La Torre advised RODRIGUEZ that HPD would be posting a job notice for a Deputy Director in the Marketing Unit ("2012 Deputy Director Position") and encouraged RODRIGUEZ to apply.

38.     In December 2012, RODRIGUEZ applied for the 2012 Deputy Director Position.

39.     However, despite De la Torre advising that the Marketing Unit was leaning towards selecting RODRIGUEZ for the 2012 Deputy Director Position, a less qualified and less experienced white male, Doron Taleporos, was selected.[1]

40.     Four years later, Doron Taleporos was demoted from Deputy Director because he was unfit for the position.

41.     At different times, between 2008 and 2017, RODRIGUEZ did not even receive opportunities to interview for open promotions, even though she performs senior level duties, without additional compensation, like training other Project Managers and addressing income compliance issues.

42.     In contrast, between 2008 and 2017, Defendants created several positions and titles with a salary range broad enough to support preferential salary increases for younger and predominantly white employees – like Jonathan Gagen and Doron Taleporos, among others – who were less qualified than RODRIGUEZ.

43.     Despite her qualifications and experience, RODRIGUEZ was not given any of these positions.

---

[1] Plaintiff offers the allegations for the 2012 Deputy Director position as background evidence, not as a basis for a timely failure to promote claim.

44.     Through 2013 and despite performing senior level duties, RODRIGUEZ's base salary remained stagnant at $52,457.00 per year.

45.     In 2014, RODRIGUEZ complained to her Union that, due to her race, she was denied the Deputy Director position given to Doron Taleporos and that she was paid less than Project Managers doing the same work that she was training.

46.     Subsequent to her complaint, her Union filed a discrimination grievance on her behalf, and in May 2014, the discrimination grievance was resolved and RODRIGUEZ's salary increase to $62,740.00.

### B. RODRIGUEZ is Passed Over for Promotion to Director of Marketing in 2014

47.     In January 2014, the position of Director for the Marketing Unit was posted ("2014 Director of Marketing Position").

48.     In or around January 9, 2014, RODRIGUEZ applied for the 2014 Director of Marketing Position.

49.     Despite RODRIGUEZ's superior qualifications and previous role acting in the Director's capacity, in or about March 2014 Defendant HERNANDEZ, a less qualified white Hispanic male, already working in HPD, was selected.

50.     When selected, Defendant HERNANDEZ lacked (and still lacks) the required compliance certification and had no program experience.

### C. RODRIGUEZ is Forced to Act as *De Facto* Marketing Unit Director without a Salary Increase or Promotion

51.     After HERNANDEZ became Director of Marketing, RODRIGUEZ was required to train HERNANDEZ on all Marketing Unit policies and procedures during weekly one-hour sessions.

52.     RODRIGUEZ was also instructed to write step-by-step tutorials for HERNANDEZ.

53.     RODRIGUEZ was also asked to draft memos and talking points for HERNANDEZ to use as a "cheat sheet" when leading meetings.

54.     RODRIGUEZ was required to help prepare HERNANDEZ for meetings and help when agency or external partners sent him inquiries.

55.     When HERNANDEZ received emails asking about a policy or procedure, he would routinely forward the email to RODRIGUEZ and insert her answer in the reply section of his email as though he was responding without consulting RODRIGUEZ.

56.     HERNANDEZ was director of the Marketing Unit in name only. RODRIGUEZ was managing and directing the Marketing Unit while also training the Director, Director Deputy and all Project Managers.

57.     Despite performing these managerial functions, RODRIGUEZ received no merit based promotion or salary increase.

58.     In or around August 2014, HPD recruited additional Project Managers to join the Marketing Unit. Since RODRIGUEZ was still training HERNANDEZ, RODRIGUEZ was again directed to train the incoming Project Managers while managing her own workload.

59.     RODRIGUEZ was also directed to coordinate training sessions and evaluate the trainee Project Managers familiarity with HPD procedures and guidelines and advise HERNANDEZ when they were ready to assume full responsibility unsupervised.

60.     RODRIGUEZ was also required to prepare the new staff with the program guidelines so they could take the examination for the required certification.

61.     Again, RODRIGUEZ received no merit based promotion or salary increase for training the new Project Managers.

**D.  RODRIGUEZ is Passed Over for Promotions to Other Positions in 2014**

62.     In January 2014, RODRIGUEZ applied for the positions of Third Party Transfer Program Project Manager and Project Manager, Year 15 Program. Despite her ample qualifications, she was not interviewed.

63.     Also in January 2014, RODRIGUEZ applied a second time for the Reso A Project Manager, Article 8A, but was not interviewed.

64.     In June 2014, RODRIGUEZ applied for the positions of Senior Project Analyst; Project Manager/Participation Loan Program and Project Manager but received no interviews.

65.     Upon information and belief, these positions were given to less qualified white and younger candidates instead of Plaintiff.

**E.  HENDRICKSON Attempts to Push RODRIGUEZ out of the Marketing Unit Due to her 2014 Discrimination Grievance**

66.     On July 15, 2015, Defendant HENDRICKSON, Deputy Commissioner of the Office of Asset & Property Management with oversight responsibilities for the Marketing Unit, met with RODRIGUEZ regarding RODRIGUEZ's concerns about her lack of career advancement (the "July 15 Meeting").

67.     At the time of the July 15 Meeting, HENDRICKSON knew that RODRIGUEZ had filed her 2014 discrimination grievance.

68.     During the July 15 Meeting, despite the fact that the Marketing Unit had open promotional opportunities that RODRIGUEZ could be considered for, Defendant HENDRICKSON directed RODRIGUEZ to apply for positions in other areas of the Agency if she wanted to remain with HPD.

69.     Following Defendant HENDRICKSON's instruction, RODRIGUEZ applied for positions outside her unit and Division. However, none of the positions Defendant HENDRICKSON recommended presented promotions or salary increases. The positions turned out to be ones that would in fact decrease her salary.

70.     When Defendant HENDRICKSON was attempting to move RODRIGUEZ out of her division, HENDRICKSON was also promoting and seeking career advancement for employees with far fewer skills, experience, and tenure than RODRIGUEZ.

71.     Similarly, when in 2015 RODRIGUEZ expressed interest in two Director positions in other parts of HPD, Defendant HENDRICKSON refused to recommend her, telling RODRIGUEZ she lacked the requisite experience, despite RODRIGUEZ having over a decade of experience working along the same lines.

72.     In September 2015, RODRIGUEZ was twice interviewed for the position of Director of Operations in the Affordable Neighborhood Cooperative Program ("ANCP"), but was passed over for promotion in favor of lesser qualified and younger candidate, Nelsy Santana, in a decision made by Defendants TALMA and ENDERLIN.

73.     In November 2015, Defendant HENDRICKSON urged RODRIGUEZ to apply for Project Manager of the Participation Loan Program ("PLP") that provided no promotional advancement or salary increase. In fact, during the interview, Michal Aronson, Director of Operations in the Division of Preservation Finance, told RODRIGUEZ accepting the position would entail a $10,000.00 reduction in her salary. A white male under the age of forty was eventually selected for the PLP Project manager position.

74.     In April 2016, RODRIGUEZ interviewed for Project Manager, Inclusionary Transactions, and Project Manager, Multi-Family New Construction Programs, two other positions Defendant HENDRICKSON had pushed her towards.

75.     During her interview for Project Manager of Multi-Family New Construction, the interviewer, Brian Cheigh, told RODRIGUEZ that no positions were available, and that the interview was a courtesy to Defendant HENDRICKSON.

### F.  RODRIGUEZ is Denied Promotion to the Deputy Director Position in 2016

76.     In April 2016, at a staff meeting ("April 2016 Staff Meeting"), Assistant Commissioner BROWN announced that Doron Taleporos, who was named Deputy Director in 2013, would be demoted.

77.     At the April 2016 Staff Meeting, Assistant Commissioner BROWN and Defendant HERNANDEZ also announced that the position of Deputy Director Taleporos was vacating would be posted.

78.     Following the April 2016 Staff Meeting, RODRIGUEZ met with the Director, Defendant HERNANDEZ, and expressed interest in the Deputy Director position. However, HERNANDEZ advised RODRIGUEZ that Assistant Commissioner BROWN would likely not consider RODRIGUEZ because HPD was looking for someone who would bring a "fresh" energy to revive the team and likely look outside the Agency.

79.     Defendants HERNANDEZ and HENDRICKSON also discouraged RODRIGUEZ from applying for the Deputy Director position in several ways.

80.     In June 2016, Defendant HERNANDEZ told RODRIGUEZ that she had out-grown marketing and should seek other opportunities.

81.     In July 2016, RODRIGUEZ was summoned by Defendant HENDRICKSON and told that Defendant HERNANDEZ had informed her that RODRIGUEZ was interested in applying once again for the Deputy Director position when vacated but that RODRIGUEZ should "think outside the box."

82.     Based on what Defendants HERNANDEZ and HENDRICKSON told her, RODRIGUEZ was discouraged from applying for Deputy Director of the Marketing Unit.

83.     Ultimately, on or about August 8, 2016, Defendants HERNANDEZ, HENDRICKSON and BROWN selected Ivan Cardona, a less experienced and less qualified white male of Hispanic descent for the Deputy Director position, who was, upon information and belief, younger than Plaintiff.

### G.  RODRIGUEZ Files an EEO Complaint and Cardona is Terminated

84.     In August 2016, in his second week in the position, Cardona scheduled one-on-one meetings with employees in the Marketing Unit. During the meetings he asked employees questions about RODRIGUEZ, including their opinion of her, her race, marital status, and age.

85.     In or about August 2016, Cardona asked RODRIGUEZ during their one-on-one meeting about her age, date of birth, race, marital status, whether she had children and how many, where her parents were born, and whether she was born in the United States or abroad.

86.     When RODRIGUEZ told Cardona she was uncomfortable answering these questions, he continued with the questions, insisting that Defendant HERNANDEZ, who arranged the meetings, approved the questions.

87.     In response, RODRIGUEZ filed a complaint with her Union and HPD's EEO office.

88. Shortly after filing her complaints, Cardona told RODRIGUEZ during a meeting that he knew she had filed a complaint about his questions. Yet, Cardona continued to ask inappropriate questions about RODRIGUEZ, including his belief that her age, background and generation limited her abilities and interpersonal skills, insinuating that RODRIGUEZ was too old to fully understand and use technology and that her cultural background hurt her communication skills.

89. RODRIGUEZ immediately reported this incident to her Union and HPD's EEO.

90. HPD failed to intervene when the Union first raised Cardona's misconduct. HPD did not take RODRIGUEZ's complaint seriously until she informed HPD's EEO Officer that she had audio recordings of Cardona's inappropriate questions.

91. Due to RODRIGUEZ's insistence and the audio recording she gave to the EEO Office, on or about August 19, 2016, Cardona was terminated as Deputy Director of Marketing three weeks into his tenure.

92. By September 2016 it was widely known within HPD that RODRIGUEZ filed the EEO complaint that caused Cardona's termination.

93. Defendants HERNANDEZ and HENDRICKSON harbor animosity and resentment against RODRIGUEZ for filing the EEO complaint that caused Cardona's termination.

94. In September 2016, Defendants HENDRICKSON and HERNANDEZ expressed displeasure that RODRIGUEZ filed the EEO complaint against Cardona.

95. On or about September 8, 2016, shortly after Cardona's termination, Defendant HERNANDEZ summoned RODRIGUEZ to his office ("September 8 meeting"), told her that he was aware of the EEO complaint and thought Cardona's termination was "hasty."

96.     At the September 8 meeting, Defendant HERNANDEZ also told RODRIGUEZ he was unhappy with the discord within the Marketing Unit due to the EEO complaint RODRIGUEZ filed and would remove anyone who was not a team player. HERNANDEZ then asked RODRIGUEZ whether she intended to remain at HPD and suggested she consider moving to other areas of the Agency.

97.     RODRIGUEZ reported this incident to her Union.

98.     Immediately after it became known that RODRIGUEZ filed the EEO complaint that caused Cardona's termination, Defendants HERNANDEZ and HENDRICKSON, and others acting in concert with and under their direction at HPD, retaliated against RODRIGUEZ.

**H.  RODRIGUEZ is Retaliated Against for Filing an EEO Complaint**

99.     In retaliation for RODRIGUEZ's EEO complaint, between September 2016 and to date, RODRIGUEZ has been subjected to differential treatment in the terms, conditions and privileges of her employment relationship with HPD by Defendants HERNANDEZ and HENDRICKSON, and others acting in concert with and under their direction at HPD.

100.    These differential terms and conditions of employment include, but are not limited to:

(a)   exclusion from meetings that other Project Mangers attended;

(b)   isolation and lack of communication about program updates that were shared with other Project Mangers;

(c)   isolation and hostility towards her by Defendants HERNANDEZ and HENDRICKSON, and others acting in concert with and under their direction at HPD;

- 14 -

(d)   excessive and incessant criticism not otherwise leveled at other Project Managers;

(e)   being targeted and harassed over trivial matters;

(f)   being pressured to complete tasks within an unrealistic time frame;

(g)   failure and refusal to consider her for positions which she was suitably and well qualified;

(h)   failure and refusal to reassign her to positions for which she was suitably and well qualified;

(i)   failure and refusal to promote her to positions for which she was suitably well qualified; and,

(j)   Despite knowledge of her qualifications and experience, relegating her to performing tasks unrelated and unsuited to her considerable experience, education and training.

101.   Since filing the EEO complaint that caused Cardona's termination, Defendant HERNANDEZ rarely communicates with RODRIGUEZ, whether in person or by email, and discontinued their biweekly one-on-one meetings, although he continues to meet with other staff who, upon information and belief, have not filed EEO complaints or engaged in protected activity.

102.   RODRIGUEZ was further targeted and harassed for any trivial matter that came up in the unit, had her workload scrutinized and nitpicked, and was pressured to complete tasks within unrealistic time frames.

103.    Defendants HENDRICKSON and HERNANDEZ also began excluding RODRIGUEZ from meetings, trainings, and other tasks and communications that Project Managers normally participate in.

104.    Overall, Defendants HENDRICKSON and HERNANDEZ have isolated RODRIGUEZ from Marketing Unit activities since she filed the EEO complaint in attempt to push her out of the Marketing Unit.

### I. HENDRICKSON and HERNANDEZ Attempt to Assign RODRIGUEZ an Undesirable Project in Retaliation for her EEO Complaint

105.    In October 2016, RODRIGUEZ passed the civil service promotional exam for the Administrative Manager title, ranking high on the list.

106.    As a result of her passing the promotional exam for the Administrative Manager title, she was appointed off the civil service exam list with no salary increase.

107.    On or about October 19, 2016, within two months of RODRIGUEZ filing the EEO complaint, Defendant HENDRICKSON summoned RODRIGUEZ to a meeting (the "October 19 meeting") and told her that her appointment was contingent upon her leaving the Marketing Unit to accept a new role, and that if she did not accept this new role, she would not be certified permanently in her new promotional title of Administrative Manager.

108.    At the October 19 meeting, Defendant HENDRICKSON falsely represented to RODRIGUEZ that per HPD policy it was mandatory for her to accept the new role as a condition of her appointment to the Administrative Manger title or forfeit the appointment.

109.    Contrary to Defendant HENDRICKSON's representation at the October 19 meeting, while it is a condition of appointment to the Administrative Manager title that if the candidate does not perform the minimum job responsibilities of the title, the unit can assign

additional duties, nothing in the provision requires that the candidate be assigned to a new role altogether.

110. Moreover, as RODRIGUEZ's duties far exceeded the minimum job responsibilities of the new title civil service title, the condition did not apply to her and the suggested "new role" would have resulted in a significant reduction in her responsibilities, being clerical in nature at best, and would have required her going out on a mobile van several days each week to counsel city residents on housing issues, an assignment that does not use her several compliance certifications.

111. In addition, none of the other candidates in RODRIGUEZ's division who were promoted off the list for the Administrative Manager title with RODRIGUEZ were taken out of their current position and forced to take a less desirable role with no potential for career advancement.

112. Defendant HENDRICKSON's representation to RODRIGUEZ at the October 19 meeting that she must leave the Marketing Unit to accept a new role was designed, and intended, to push RODRIGUEZ out of the Marketing Unit.

113. Immediately after the October 19 meeting, RODRIGUEZ later that day notified her Union that her appointment to the Administrative Manager title was being threatened and that she was being forced to accept a less desirable role. As a result, the Union requested a labor meeting with HPD.

114. In or about October 31, 2016, RODRIGUEZ also requested a meeting with EEO to file a retaliation and hostile work environment complaint. However, the EEO Officer dissuaded her from filing another complaint and suggested that she consider accepting the new role to avoid further retaliation.

115.   In or around November 9, 2016, RODRIGUEZ met with Defendant HENDRICKSON to further clarify the functions of this new role (the "November 9 meeting").

116.   At the November 9 meeting, Defendant HENDRICKSON confirmed to RODRIGUEZ that she would be assigned to a mobile van several days per week. RODRIGUEZ would travel through underserved areas to counsel the public on housing issues. Defendant HENDRICKSON also advised that the new role would require that RODRIGUEZ no longer work any of her current duties, essentially squandering her experience, certifications and education.

117.   It was also confirmed at the November 9 meeting that the new role and position would not be posted; and no job description or budget line existed for this new special task that was specifically created for RODRIGUEZ as a requirement to be appointed after the civil service list into the title of Administrative Manager, with no salary increase.

118.   At a separate meeting on November 16, 2016 (the "November 16 meeting"), Defendant HERNANDEZ advised RODRIGUEZ to accept the "new role" since she had outgrown her position as a Project Manager in the Marketing Unit and hit a "glass ceiling."

119.    At the November 16 meeting, Defendant HERNANDEZ insisted that there was nowhere for RODRIGUEZ to grow in the Marketing Unit, and that he would start reducing her workload in preparation for the transition.

120.   As a result of the conditions of the "new role," on October 25, 2016, RODRIGUEZ declined the position because it did not provide job stability or career advancement, and was in retaliation for her filing the EEO compliant against Cardona.

121.   In response, RODRIGUEZ endured further retaliation and hostility.

**J.  RODRIGUEZ is Further Harassed in Retaliation by Taleporos, HERNANDEZ and PELL**

122.    As part of the ongoing hostility towards her, on January 26, 2017, RODRIGUEZ was verbally attacked by former Deputy Director Taleporos who confronted RODRIGUEZ at her desk and instigated a loud argument over policy, yelling and pointing a finger in her face.

123.    RODRIGUEZ, who feared physical harm from the larger male employee blocking her inside a small cubicle, reported the incident to her Union and Defendant HERNANDEZ. But HERNANDEZ brusquely dismissed her concerns.

124.    Instead, on February 16, 2017, RODRIGUEZ was singled out and issued disciplinary charges for the incident relating to her complaints about Taleporos' aggressive behavior. Taleporos, the instigator, faced no charges.

125.    Prior to February 16, 2017, RODRIGUEZ, in her long career with the City and HPD,  had never been the subject of disciplinary charges.

126.    On February 10, Defendant HERNANDEZ threatened to mark RODRIGUEZ "absent without leave" for the prior day when RODRIGUEZ had been in the field on an assignment and returned to the office as soon as she was finished.

**K.  Defendant PELL Joins HPD**

127.    In February 2017, Defendant PELL, a 25-year-old, replaced Cardona as Deputy Director for the Marketing Unit.

128.    Defendant PELL was selected by Defendants HERNANDEZ and HENDRICKSON.

129.    Defendant BROWN also assisted in selecting the less experienced PELL to be Deputy Director over RODRIGUEZ.

130.    RODRIGUEZ did not have the opportunity to apply to the Deputy Director position as it was not reposted or publicly announced before PELL's hiring by Defendants HERNANDEZ, HENDRICKSON, and BROWN.

131.    Upon assuming the position, Defendant PELL would insist that RODRIGUEZ train her to understand the duties of her position and for the sole purpose of learning her job functions from RODRIGUEZ, demanded that RODRIGUEZ copy her on every email, would follow email chains where RODRIGUEZ was communicating with agents, made her sit with her when performing certain tasks, and gave her orders to perform tasks that were not high in priority so PELL could learn how to perform the tasks.

132.    From the beginning of her tenure in the Marketing Unit, Defendant PELL was overly aggressive and heavy handed toward RODRIGUEZ.

133.    From the start of her tenure, PELL also made it clear that she was aware of Plaintiff's discrimination complaints and would join Defendants HERNANDEZ and HENDRICKSON and others in the continuing retaliation and hostile work environment.

## L. PELL Retaliates Against RODRIGUEZ for Opposing Discriminatory Housing Practices

134.    Since joining the Marketing Unit, Defendant PELL has joined HERNANDEZ in subjecting RODRIGUEZ to abuse and mistreatment not leveled against others in retaliation for her complaints of EEO violations and violations of affordable housing selection process on the basis of race to disadvantage African American housing applicants.

135.    Defendant PELL's abuse and mistreatment of RODRIGUEZ, not otherwise leveled against others, include but are not limited to the following:

(a) Threatening and rejecting RODRIGUEZ's time and leave requests without justification;

(b)  Denying her overtime she worked contrary to unit policy that allows 5 hours of such work without advance notice;

(c) Failing to approve her timesheet resulting in her not receiving her pay check;

(d) Screaming at her to answer the phone even when she was on the phone working;

(e)  Undermining her work decisions;

(f)  Sabotaging her work and performance; and

(g) Verbal and physical abuse and general hostility towards her.

136.    Before working for HPD, Defendant PELL worked as an occupancy compliance coordinator for a non-profit agency that works with HPD to provide affordable housing to low and moderate income families (the "developer"). While working for the developer, Defendant PELL would send files for applicants seeking affordable housing subsidized by HPD, such as the Brooklyn Grand project.

137.    As a project manager, RODRIGUEZ reviewed those files to determine final eligibility and regularly emailed with Defendant PELL while she was employed by the developer.

138.    During that time, RODRIGUEZ emailed Defendant PELL about the status of an African American applicant who was eligible for an affordable housing lottery in the Brooklyn Grand project but not processed by Defendant PELL's office.

139.    On her first day working for HPD, February 13, 2017, Defendant PELL questioned RODRIGUEZ's decision regarding the final eligibility of tenants for units in the Brooklyn Grand project, and made clear her intention to reverse those determinations, including for the eligibility of the African American applicant.

140.    Defendant PELL was supporting the developer, her former employer, who was improperly rejecting non-Hispanic applicants for units in the project.

141.    The African American applicant was eligible and entitled to the unit based on her lottery log number.

142.    RODRIGUEZ knew and believed in good-faith, based on her experience with housing law and City rules and policies, that it was impermissible to base lottery decision on race or national origin and that it was improper to deny an African American applicant in favor of a Hispanic applicant who was lower on the list.

143.    Beginning in or around February 13, 2017, RODRIGUEZ protested, to no avail, PELL's improper and discriminatory actions of rejecting non-Hispanic applicants for housing units in the Brooklyn Grand project, including the African American applicant.

144.    During the same period, RODRIGUEZ also complained and reported to Defendants HERNANDEZ and HENDRICKSON as well as Assistant Commissioner BROWN about PELL's improper and discriminatory refusal to adhere to the tenant selection plan and affordable housing process in order to harm non-Hispanic applicants.

145.    Rather than address her concerns, Defendant HERNANDEZ warned RODRIGUEZ to "back down" or she would be removed from the Brooklyn Grand project if she did not reject the African American applicant pursuant to Defendant PELL's instructions

146.    In or about May 2017, BROWN told RODRIGUEZ that HERNANDEZ would address the problem and that she did not need to be concerned.

147.    In or about May 2017, BROWN also told RODRIGUEZ that HPD Commissioner Maria Torres-Springer was looking into the matter. HERNANDEZ and PELL were both aware of the complaint of RODRIGUEZ to BROWN, and as a result, beginning on or about February

13, 2017, took a number of adverse employment actions against RODRIGUEZ, including denying her promotions, subjecting her to unwarranted discipline, demoting her, physically assaulting her, having her duties reduced to menial clerical tasks, and all her projects reassigned.

148.   On February 15, 2017, at RODRIGUEZ's first one-on-one meeting with Defendant PELL (the "February 15 meeting"), Defendant PELL informed RODRIGUEZ that she was aware of the circumstances under which Cardona, the former deputy director was terminated, and asked RODRIGUEZ if she would have any problems taking direction from a younger "boss."

149.   Following the February 15 meeting, Defendant PELL was constantly trying to sabotage and provoke RODRIGUEZ by ordering her to do something and then reprimanding her for doing so; giving her vague and unclear instructions, and trying to suggest that she did not follow her instructions; luring her into her office to pick-up a document and either reprimanding her for doing so or accusing her of being rude once she is in her office.

150.   After yelling at RODRIGUEZ for days about answering the phones, Defendant PELL sent her a meeting request for February 28, 2017 entitled "Issues" (the "February 28 meeting").

151.   During the February 28 meeting, Defendant PELL falsely accused RODRIGUEZ of always being on her office phone, although she was unsure as to the nature of the calls, and being rude and disrespectful. RODRIGUEZ immediately asked to stop the meeting so she could obtain union representation.

152.   On May 2, 2017, Defendant PELL yelled at RODRIGUEZ unprovoked and threatened to have RODRIGUEZ's time and leave revoked. RODRIGUEZ complained about this incident to Defendant HERNANDEZ, who ignored her complaint.

153.    The following day, May 3, 2017, Defendant PELL issued RODRIGUEZ a disciplinary memorandum, charging her with insubordination for not appearing for a meeting that, in reality, Defendant PELL had never scheduled or issued a request for.

154.    On May 10, 2017, while RODRIGUEZ was speaking with a colleague, Defendant PELL approached the pair and yelled at RODRIGUEZ again in a threatening and abusive tone. RODRIGUEZ also reported this May 10 incident immediately to the disciplinary unit, to no avail.

155.    Since at least February 13, 2017, RODRIGUEZ has also been complaining to Defendant HERNANDEZ and HPD's Disciplinary Unit about PELL's unlawful conduct towards her. However, HPD took no action despite an acknowledgement from the Director of the Disciplinary Unit, Siheem Roseborough, that her claims about being yelled at and humiliated by Defendant PELL were corroborated.

156.    Instead, on May 24, 2017, RODRIGUEZ was called to the Disciplinary Unit to face new charges of insubordination based on Defendant PELL's May 3 memorandum. During this meeting, Investigator Daniel Carcana told RODRIGUEZ that "things are going to get bad for [you]." RODRIGUEZ attempted to follow-up on her complaints regarding Defendant PELL's verbal abuse, again to no avail.

157.    On May 25, 2017, RODRIGUEZ advised a New York City Department of Investigation investigator that Defendants HERNANDEZ and PELL were allowing the developer to violate the lottery process. The investigator said that she would be contacting Defendant HERNANDEZ.

158.    On May 31, 2017, Defendant PELL escalated her abuse to the physical. When RODRIGUEZ was returning to her desk from the copy machine Defendant PELL, who was

walking past, intentionally bumped RODRIGUEZ with her shoulder and sent her falling into filing cabinets. RODRIGUEZ immediately reported the incident to the Disciplinary Unit.

159.    As a result of her EEO complaint and Defendants' continued retaliation, on May 31, 2017, while remaining a staff of the division, RODRIGUEZ was relocated by Defendants HERNANDEZ and PELL and others acting in concert with them, to the Strategic Research Division on another floor, her duties reduced to menial clerical tasks, and all her projects reassigned.

160.    Although RODRIGUEZ was advised she would be a liaison for marketing related issues on the few assignments she received, Defendant HERNANDEZ told her not to speak with his staff or contact the Marketing Unit.

161.    The relocation, which RODRIGUEZ was promised would be temporary for approximately six weeks, until a new, permanent position was established, continues to date.

162.    Presently, RODRIGUEZ has no workload or clear responsibilities and is seated in the Strategic Research Division handling menial work.

163.    In July 2017, RODRIGUEZ filed an online complaint with the New York City Conflicts of Interest Board about the housing lottery violations.

164.    Prior to May 2017, the African American applicant had filed complaints with advocacy groups and was communicating with the HPD Commissioner's office. Ultimately, the attention her file received for being unfairly rejected forced HPD to process her application in accordance with the tenant selection guidelines for the lottery and she was granted an affordable housing unit, in or around July 2017.

### M. RODRIGUEZ Continues to be Denied Promotions

165.   Between June and August 2017, RODRIGUEZ applied for the positions of (i) Project Manager, LIHTC Preservation Program; (ii) Project Associate; (iii) Project Manager for Leveraged Preservation Programs; (iv) Project Manager, Inclusionary Housing; (v) Senior Project Manager; (iv) Special Underwriting Project Manager and Director of Operations, Division of Neighborhood Preservation (DNP).

166.   Although RODRIGUEZ was more than qualified for each position, she was not interviewed for any position due to her EEO complaint and Defendants' continued retaliation.

167.   Upon information and belief, the positions were given to younger and non-black candidates who had not complained or engaged in protected activity or opposed improper governmental conduct or discriminatory housing practices.

### N. HPD has a Long History of Discriminatory Employment Practices

168.   Over the years, HPD has instituted preferential employment policies and customs designed to hire, retain, and reduce the rate of turnover among younger and mostly white employees. In doing so, HPD engaged in a pattern of racial discrimination and retaliation based on the failure to promote minority employees, such as RODRIGUEZ.

169.   Pursuant to HPD's preferential policies and customs, these newer, younger and white employees were provided special treatment and diverse opportunities to move and advance within various HPD programs and, in some instances, from division to division, providing them with a more diverse and deeper overall experience within HPD.

170.   Defendant CITY, through HPD, did not offer comparable opportunities to Plaintiff, and other employees, who were older and predominantly non-white.

171.   Defendant HPD's deliberate policies and customs of providing special

opportunities and exposure to these younger, white employees enhanced their professional growth and led to guaranteed career advancement and salary increases. These opportunities often manifested in high-profile and premiere projects that garnered publicity for HPD.

172.    In contrast, HPD has acknowledged that older employees, such as Plaintiff, are viewed only as a resource for leveraging information and for nurturing and training the newer hires. That perception at HPD, together with the active policy and custom of favoring the newer, younger, mostly white employees, has marginalized the older and minority staff and has created an atmosphere within HPD that promotes and condones "career and salary stagnation" for the older employees above the age of 40 years, particularly those who are of African American, Hispanic, or otherwise of non-white race or ancestry.

173.    For several years following the institution of the discriminatory policies described above, RODRIGUEZ and other well-qualified staff have performed the same work as the newer, younger and non-minority employees with limited or no career advancement.

174.    Furthermore, RODRIGUEZ and others like her not only perform the same work as the younger, newer and non-minority employees, they are frequently paid less and given heavier and more onerous duties and assignments, including training the newer employees to perform duties of positions to which Plaintiff had been denied promotion and attendant pay increases.

175.    Plaintiff has been consistently passed-over for promotions and salary increases, or simply not considered for career growth opportunities, in favor of younger, less experienced, and overwhelmingly white employees who have relied on the training and expertise of the Plaintiff to navigate and gain experience in the various programs and departments within the Office of Development and throughout HPD. As a consequence, these younger, white employees often

advanced to supervise the very employees who have trained and developed them within the Agency.

176.    Defendant CITY maintains a policy and custom of fast tracking younger, newer and white employees by placing them on high-profile and premiere development deals and giving them more deals than older, non-white employees in an effort to enhance their image and promote them more quickly.

177.    In addition to the foregoing discriminatory and surreptitious tactics, Defendants would simply stonewall employees like Plaintiff, by refusing to respond to their applications for open positions or formally inform them whether or not a decision had been reached or a candidate selected for such open positions. As a consequence, Plaintiff and others similarly situated are discouraged from applying for promotional opportunities – the message being: "don't even bother."

178.    In or about April 2007, and partly in response to complaints regarding the Agency's preferential advancement policies, HPD's then-Commissioner, Shaun Donovan, commissioned a Staff Working Group to address issues surrounding career development within HPD in general and its Office of Development in particular.

179.    The published outcome of the Staff Working Group consistently identified that older, more experienced employees had strong resentment toward and dissatisfaction with existing obstacles to career advancement and the preferential hiring policies and practices within HPD.

180.    In or about September 2009, the President of Local 375, District Council 37 complained to HPD regarding the foregoing preferential and discriminatory employment practices.

181.   In or about September 2009, older, black employees also protested these practices in a written complaint to Letitia James, who then served as a member of the New York City Council.

182.   The CITY, HPD and the named Defendants knew, and ought reasonably to have known, that the consequence of these policies and customs was an adverse impact on the prospects, as well as on the terms and conditions of employment, of its older and minority employees.

**O.  Defendants' Actions Continue and Warrant Injunctive and other Relief**

183.   Defendants' actions were unlawful and in violation of Plaintiff's rights under several federal laws such as Section 1981, and State and local laws, such as the New York City Human Rights Law, and New York State Human Rights Law.

184.   As a proximate result of Defendants' conduct, RODRIGUEZ has suffered and continues to suffer monetary loss, and damages, including the loss of past and future earnings, and other employment benefits.

185.   As a further proximate result of Defendants' actions, RODRIGUEZ has suffered and continues to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

186.   The individual defendants' conduct was outrageous and malicious, was intended to injure Plaintiff, and was carried out with reckless indifference to Plaintiff's protected civil rights, thereby entitling her to punitive damages.

187.   Plaintiff has no complete, plain, clear, or adequate remedy at law.

188.   Defendants must be restrained from further retaliation and discrimination against Plaintiff and directed to cease and desist from their unlawful acts against Plaintiff.

189.   The acts of Defendants against RODRIGUEZ continue.

190.   Plaintiff believes that Defendants' unlawful acts against her will continue until this Court compels otherwise.

### FIRST COUNT AGAINST DEFENDANTS CITY, HENDRICKSON, HERNANDEZ AND BROWN
#### (Race Discrimination Pursuant to Sections 1983 and 1981)

191.   Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

192.   Defendants subjected Plaintiff to differential terms and conditions of employment because of her race.

193.   These differential terms and conditions of employment include, but are not limited to:

a.   Failure to grant Plaintiff merit-based salary increases;

b.   Failure to hire and promote Plaintiff to higher paying titles and positions within HPD, including:

   i.   The Director of the Marketing Unit position in 2014 that was given to Defendant HERNANDEZ;

   ii.   The Deputy Director of Marketing Unit position in 2016 that was given to Ivan Cardona;

c.   Depriving Plaintiff of opportunities for career advancement;

d.   Implementing and enforcing a blanket policy of nurturing, promoting, compensating and advancing the careers of younger, white employees, to the detriment of Plaintiff.

194.   Defendants took all the foregoing actions in order to deprive Plaintiff of

employment and other contractual opportunities on account of her race.

195.    Because of Defendants' willful and deliberate actions, and as a proximate cause thereof, Plaintiff has been and continues to be denied her right to equal employment opportunity in violation of Section 1981.

196.    By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial.

### SECOND COUNT AGAINST DEFENDANTS CITY, HENDRICKSON, HERNANDEZ AND BROWN
#### (Race and Color Discrimination in Violation of NYSHRL)

197.    Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

198.    By adversely affecting the terms, conditions, and privileges of Plaintiff's employment because of her race and color, Defendants violated the New York State Human Rights Law.

199.    By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial.

### THIRD COUNT AGAINST DEFENDANTS CITY, HENDRICKSON, HERNANDEZ AND BROWN
#### (Race and Color Discrimination in Violation of NYCHRL)

200.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

201.    By adversely affecting the terms, conditions, and privileges of Plaintiff's employment because of her race and color, Defendants violated New York City Human Rights Law.

202.    By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to

be determined at trial.

**FOURTH COUNT AGAINST DEFENDANTS CITY,**
**ENDERLIN, TALMA, HENDRICKSON, HERNANDEZ AND BROWN**
**(Age Discrimination in Violation of NYSHRL and NYCHRL)**

203.    Plaintiff hereby repeats and realleges each allegation in each numbered paragraph

above.

204.    As a direct and proximate result of Defendants' willful and deliberate actions

alleged herein, Plaintiff has been discriminated against with respect to the compensation, terms,

conditions, or privileges of her employment, because of her age, in violation of NYSHRL and

NYCHRL.

205.    Such terms and conditions include, but are not limited to:

    a.  Segregating and classifying HPD employees in a manner which tends to deprive,
and, in fact, deprived Plaintiff of employment opportunities because of her age;

    b.  Initiating, implementing and enforcing a blanket policy of nurturing, promoting,
compensating and advancing the careers of younger employees under the age of
40, to the detriment of Plaintiff;

    c.  Failing to promote and/or grant increases in merit-based salary and other
compensation to Plaintiff because of her age, including for:

        i.  The Director of Operations, ANCP, position in 2015 that went to Nesly
Santana;

        ii.  The Deputy Director of Marketing Unit position in 2016 that went to Ivan
Cardona;

        iii.  The Deputy Director of the Marketing Unit position in 2017 that went to
Defendant PELL.

206.    By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial.

207.    Plaintiff is entitled to declaratory judgment that the employment policies, practices and procedures adopted and implemented by Defendants as alleged herein, are unlawful and violate the NYSHRL and NYCHRL.

208.    Unless injunctive relief is granted, Plaintiff, who is otherwise eligible for rights, benefits, and protections afforded by NYSHRL and NYCHRL will be irreparably harmed by Defendants' continued refusal to comply with their statutory obligations.

209.    By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial.

### FIFTH COUNT AGAINST DEFENDANTS
### CITY, HENDRICKSON, HERNANDEZ, PELL AND BROWN
(Retaliation Pursuant to Sections 1983 and 1981)

210.    Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

211.    By the acts described above, Defendants retaliated against Plaintiff RODRIGUEZ for her complaints against and resistance to discriminatory and unfair employment practices in violation of Sections 1983 and 1981, as recounted above.

212.    Defendants CITY, PELL, BROWN and HERNANDEZ also retaliated against RODRIGUEZ for opposing discriminatory housing lottery practices by aiding, assisting, and encouraging an African American applicant who was wrongly rejected for subsidized housing and was attempting to exercise and enjoy her rights to secure housing free from intentional discrimination on the basis of race and color.

213.    Because of Defendants' retaliatory conduct, RODRIGUEZ suffered loss and

damage in an amount to be determined at trial.

## SIXTH COUNT AGAINST DEFENDANTS CITY, HENDRICKSON, HERNANDEZ, PELL AND BROWN
### (Retaliation in Violation of NYCHRL)

214.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

215.     By the acts described above, Defendants retaliated against Plaintiff RODRIGUEZ for her complaints against and resistance to discriminatory and unfair employment practices in violation of the NYCHRL.

216.     Defendants CITY, PELL, BROWN and HERNANDEZ also retaliated against RODRIGUEZ for opposing discriminatory housing lottery practices by aiding, assisting and encouraging an African American applicant who was wrongly rejected for subsidized housing and was attempting to exercise and enjoy her rights under the NYCHRL regarding fair housing laws.

217.     Because of Defendants' retaliatory conduct, RODRIGUEZ has suffered loss and damage in an amount to be determined at trial.

## SEVENTH COUNT AGAINST DEFENDANTS CITY, HENDRICKSON, HERNANDEZ, PELL AND BROWN
### (Retaliation in Violation of NYSHRL)

218.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

219.     By the acts described above, Defendants retaliated against Plaintiff RODRIGUEZ for her complaints against and resistance to discriminatory and unfair employment practices in violation of the NYSHRL.

220.     Defendants CITY, PELL, BROWN and HERNANDEZ also retaliated against

RODRIGUEZ for opposing discriminatory housing lottery practices by aiding, assisting, and encouraging an African American applicant who was wrongly rejected for subsidized housing and was attempting to exercise and enjoy her rights under the NYSHRL regarding fair housing laws.

221.    Because of Defendants' retaliatory conduct, RODRIGUEZ has suffered loss and damage in an amount to be determined at trial.

## EIGHTH COUNT AGAINST DEFENDANTS CITY, PELL, BROWN and HERNANDEZ
### (Retaliation in Violation of the Fair Housing Act)

222.    Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

223.    Defendants have violated the Fair Housing Act, 42 U.S.C. § 3617, by retaliating against Plaintiff for an African American applicant's exercise of rights granted or protected by the Fair Housing Act.

224.    Plaintiff was abused and retaliated against because she reported, complained, objected and protested to Defendants PELL, HERNANDEZ and BROWN that Defendant PELL was improperly and unlawfully violating housing lottery procedure to disfavor non-Hispanic applicants while aiding her former employer and in retaliation for aiding and encouraging an African American applicant.

225.    Because of Defendants' intentional and willful retaliatory conduct, RODRIGUEZ has suffered loss and damage in an amount to be determined at trial.

## NINTH COUNT AGAINST DEFENDANT CITY
### (Violation of Section 75-b, New York Civil Service Law)

226.    Plaintiff hereby repeats and realleges each allegation in each numbered paragraph

above.

227.    Plaintiff was abused and retaliated against because she reported, complained, objected and protested to Defendants PELL, HERNANDEZ and BROWN that Defendant PELL was improperly and unlawfully violating housing lottery procedure to disfavor non-Hispanic applicants while aiding her former employer.

228.    Defendant CITY is therefore in violation of Section 75-b of the New York Civil Service Law and engaged in unlawful retaliatory personnel action against Plaintiff because she disclosed to superiors and governmental bodies information which she reasonably believed to be true, and which she reasonably believed to constitute improper governmental action.

229.    Pursuant to Section 75-b(3)(c) of the New York Civil Service Law, Plaintiff therefore commences this action under "the same terms and conditions as set forth in article Twenty-C of the Labor Law (Lab. Law § 740)."

**VI.    PUNITIVE DAMAGES**

230.    By reason of the wanton, unrepentant, reckless, and egregious conduct of the individual Defendants, Plaintiff claims punitive damages.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

a)  Issue an order for injunctive relief enjoining HPD from further withholding merit-based salary increases, promotion, and career advancement opportunities to Plaintiff on the basis of race, color, age or engagement in protected activity;

b)  Issue a judgment declaring that the HPD's denial of promotions to Plaintiff and retaliation against Plaintiff is unlawful in that it violates Section 1981 and the laws of New York State and New York City;

c) Award compensatory damages for all causes of action in amounts that are fair, just and reasonable, to be determined at trial;

d) Award punitive damages for all causes of action;

e) Award Plaintiff attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2), and the NYCHRL;

f) Award all Plaintiff's costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988, fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2), and the NYCHRL; and

g) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York
February 21, 2018

Respectfully Submitted,

SAMUEL O. MADUEGBUNA (6084)
MADUEGBUNA COOPER LLP
Attorneys for Plaintiff
30 Wall Street, 8th Floor
New York, New York 10005
(212) 232-0155

TO: **DEFENDANTS**

THE CITY OF NEW YORK
c/o Corporation Counsel
Law Department
100 Church Street
New York, New York 10007

ANNE-MARIE HENDRICKSON
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038

ERIC ENDERLIN,
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038

VICTOR HERNANDEZ
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038

MARGARET BROWN
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038

SHATARA PELL
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038
LISA TALMA,
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*                    *Docket No.:*

-------------------------------------------------------------------------------------------------------------

*KARINA RODRIGUEZ,*

*Plaintiff,*

*-against-*

*THE CITY OF NEW YORK, ANNE-MARIE HENDRICKSON, ERIC ENDERLIN, VICTOR HERNANDEZ, SHATARA PELL, MARGARET BROWN, LISA TALMA, and JOHN and JANE DOES 1-5 (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),*

*Defendants.*

-------------------------------------------------------------------------------------------------------------

### COMPLAINT AND JURY DEMAND

-------------------------------------------------------------------------------------------------------------

*Signature (Rule 130-1.1-a)*

_____

*Print name beneath*
*SAMUEL O. MADUEGBUNA, ESQ.*

_____

*Yours, etc.*

*MADUEGBUNA COOPER LLP*
*Attorneys for Plaintiff*
*30 Wall Street, 8th Floor*
*New York, New York 10005*
*(212) 232- 0155*

*To: All Counsel of Record*

*Service of the within is hereby admitted on*
_____

*Attorneys for*